## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

LEROY SIMPSON-BROWN,       )
                                )
       Plaintiff,               )
                                )
       v.                     )          No. 4:25-cv-00501-DGK
                                )
BANK OF AMERICA, N.A.,       )
                                )
       Defendant.            )

## ORDER ON COURTHOUSE ACCESS AND COMMUNICATION
## RESTRICTIONS FOR THE REMAINDER OF CASE

This case arises from Defendant Bank of America allegedly putting an erroneous fraud alert restriction on Plaintiff Leroy Simpson-Brown's bank account. According to Plaintiff, the fraud alert was entered into an inter-bank system that prevented Plaintiff from being able to open bank accounts at other institutions. After some informal dispute resolution attempts with Defendant, Plaintiff filed a pro se lawsuit in the Circuit Court of Jackson County, Missouri, alleging claims under the Fair Credit Reporting Act, 15 U.S.C. § 1681, and Missouri state law. On June 30, 2025, Defendant removed the case here based on federal question and diversity jurisdiction. ECF No. 1.

In the one month this case has been pending, Plaintiff has filed thirty-five motions and another sixteen notices of filing. The Court[1] will address the substance and nature of these filings in a separate order as well as Plaintiff's repeated violation of the Court's orders. This order concerns Plaintiff's alleged misconduct while making filings in the courthouse and his communications with courthouse employees.

---

[1] Although it is clear from the context in this order and all previous orders, "the Court" or "The Court" refers to the undersigned judge.

After being informed about a particularly long and volatile incident on July 9, 2025, the Court set a show cause hearing about whether—and if so, to what extent—Plaintiff should have his courthouse access restricted. ECF No. 28. In that order and subsequent orders based on additional alleged misconduct (ECF Nos. 30, 40), the Court set interim restrictions on Plaintiff's courthouse access and on his modes of communication with courthouse personnel pending the show cause hearing.

On July 24, 2025, the Court held the show cause hearing. After hearing testimony from several courthouse employees, law enforcement, and Plaintiff, the Court issued another temporary order that barred Plaintiff from physically accessing the courthouse except for court hearings and placed restrictions on his communications with courthouse staff and the Court's staff. ECF No. 61. The Court also signaled it would be issuing a more in-depth order regarding the Court's findings of fact and conclusions of law. This is that order.

For the following reasons, it is ORDERED that:

1. Plaintiff shall not enter the Charles Evans Whittaker United States Courthouse located at 400 East Ninth Street, Kansas City, Missouri 64106, unless he has a court hearing in one of his cases;
2. If Plaintiff enters the courthouse for a hearing in one of his cases, he must immediately report to a Court Security Officer in the lobby and request an escort to and from the courtroom and shall not enter the Clerk's Office under any circumstance;
3. Plaintiff is prohibited from calling or emailing the Court's staff, the Clerk of the Court, or the Clerk of the Court's staff—including any member of the Clerk's Office—about this case; and
4. All communications with the Court about this case must be made in writing and filed via the mail or through the Electronic Document Submission System ("EDSS").[2] No filings shall be made via email.

These restrictions will stay in place through final judgment in this case. The restrictions in this order override and replace all previous restrictions and any provisions in the Court's Initial

---

[2] The EDSS is a service that may be used by self-represented parties who need to file documents with the court as an alternative to mailing or bringing the documents to the courthouse. Documents will be processed by the next business day. This system is available here: Electronic Document Submission System | Western District of Missouri.

2

Standing Order ("ISO") (ECF No. 13) that allow for emailing or calling the Court's staff in a few limited situations. The Court will also be referring Plaintiff's conduct to the Chief Judge of this District to determine whether these restrictions or more expanded ones should become permanent at the conclusion of this case.

The Court warns Plaintiff that failure to follow the restrictions may result in the imposition of civil sanctions under Federal Rule of Civil Procedure 11, Rule 41(b), 28 U.S.C. § 1927, and/or the Court's inherent authority. These sanctions may include monetary fines, limitations on his filing privileges, and/or dismissal of this case with or without prejudice. Failure to follow the Court's orders may also result in the imposition of criminal penalties for criminal contempt of court under 18 U.S.C. § 401 and/or the Court's inherent authority.

## Background

Below is a summary of the procedural history for one of Plaintiff's relevant prior cases and this case, the testimony from the show cause hearing, and the resulting administrative burden from Plaintiff's actions.

### I.     Procedural History

On May 19, 2025, prior to filing this case, Plaintiff filed another case in this Court. *See Simpson-Brown v. Dube*, 4:25-cv-00378-GAF, ECF No. 1 (W.D. Mo. May 19, 2025). There, Plaintiff sought to proceed in forma pauperis ("IFP"). *Id.* The presiding judge denied his motion for leave because he found that although Plaintiff qualified economically for IFP, his complaint failed to state a claim and his claims were barred. *Id.*, ECF No. 5. The presiding judge then denied Plaintiff's motion to reconsider, *id.*, ECF No. 11, and the Eighth Circuit affirmed, *id.*, ECF No. 15.

After that case was dismissed, but before the Eighth Circuit affirmance, this case was removed here on June 30, 2025. The next day, Plaintiff filed six motions and two notices of filing

that collectively sought default judgment, striking of certain filings, remand, and expedited review of all these motions. ECF Nos. 4–8, 10. On July 3, 2025, Defendant sought a short extension of time to respond to Plaintiff's complaint. ECF No. 15. Because Defendant's answer deadline was the Monday after the July Fourth holiday weekend and because the Court almost always grants short extension requests like this as a matter of courtesy, the Court granted the extension without waiting for Plaintiff's response. ECF No. 16.[3]

Between July 3 and July 7, 2025, Plaintiff filed another five motions and four notices of filing. In those filings, he challenged the Court's granting of Defendant's extension request, raised further concerns about the removal process, and started accusing the Court of judicial bias. ECF Nos. 18–25. On July 9, 2025, Plaintiff filed two more motions that alleged Defendant's misconduct in removal and sought expedited review of motions. ECF Nos. 26–27.

That same day, the Court received multiple reports from courthouse staff that Plaintiff had been verbally abusive to staff and caused a lengthy disruption in the Clerk's Office and the courthouse lobby. The Court received further reports that the presence of many law enforcement officers was necessary to deescalate the situation, and that Plaintiff had engaged in similar behavior in the past.

Since the Court—in more than thirty years on the bench—has never received a report that raised such serious security and well-being concerns for the courthouse staff, law enforcement, and the public, the Court immediately entered a show cause order (the "Show Cause Order"). ECF No. 28. The Show Cause Order identified the alleged conduct, ordered Plaintiff to appear for a show cause hearing to determine whether his courthouse access should be restricted, and

---

[3] The Court did not want Defendant to expend unnecessary time and resources over the holiday weekend drafting an answer or motion to dismiss waiting for the Court to rule on its motion for an extension of time. In fact, later in the case, when Plaintiff sought to move the show cause hearing, the Court granted his extension request without waiting for Defendant's response. This is the Court's common practice on minor extension requests.

4

temporarily barred Plaintiff from entering the courthouse unless he was attending a court hearing or submitting filings through a drop box outside the Clerk's Office. *Id.* at 1–2. The Show Cause Order further made clear that Plaintiff was prohibited from entering the Clerk's Office. *Id.* at 2.

The next morning, Plaintiff called the Court's chambers. He was demanding, aggressive, and refused to answer basic questions during the short call. As best the Court's staff could tell, Plaintiff was seeking to move the show cause hearing because it conflicted with a scheduled hearing date in one of his state court cases. When Plaintiff became combative and argumentative, the Court's staff ended the call. Plaintiff called chambers several more times, but the Court's staff did not answer the call because of his conduct and because the call violated the ISO.

The Court then entered an order about the call ("ISO Violation Order"). ECF No. 30. The Court described Plaintiff's behavior during the call, noted how it was consistent with his reported behavior in the Clerk's Office, and explained how his call violated the ISO prohibitions on ex parte communications and phone calls. *Id.* at 1. The Court directed Plaintiff to file any request for an extension of time through a motion filed via: "(1) the mail; (2) the drop box outside the clerk's office; or (3) the Court's Electronic Document Submission System ('EDSS')." *Id.* The Court also told Plaintiff that "[f]ilings cannot be made via email" and that all electronic filings must be made through the EDSS. *Id.* n.1. The same day the order was entered, the Court's staff emailed Plaintiff a courtesy copy.

A few hours later, Plaintiff sent several emails and filings to the Court's staff accusing them of mislabeling his filings[4] in ECF, refusing to provide their name during the call,

---

[4] Throughout many of his motions, Plaintiff repeatedly complains that his filings have been mislabeled on the ECF docket. The titling of filings on the ECF docket does not impact how the Court considers or rules on any given motion. The ECF titling is simply a reference tool. In reviewing the motions, the Court always reviews the motion itself any attachment to it to determine what relief the litigant is seeking. So there is no legal basis to complain about how certain filings have been titled on the ECF docket.

5

manipulating docket entries, and entering orders without the Court's consent, among many other grievances. ECF No. 58 at 38–66. Between when the Court entered the ISO Violation Order and mid-day the next day, Plaintiff filed six more motions and two notices of filing. ECF Nos. 31–39. Many of these filings were also sent to the Court's staff and the Clerk of the Court via email, ECF No. 58 at 38–90, despite the Court explicitly stating in the ISO Violation Order that filings cannot be made via email, ECF No. 30 at 1 n.1.

Among the barrage of motions was Plaintiff's request to move the show cause hearing. ECF No. 32. The Court promptly granted that motion and entered an order ("Additional Restrictions Order") moving the show cause hearing date to accommodate a hearing in one of Plaintiff's other pro se cases at the state level. ECF No. 40. In the Additional Restrictions Order, the Court noted that since the ISO Violation Order had been entered the previous day, Plaintiff had attempted to make several filings via email and sent the Court's staff and other courthouse staff emails raising baseless claims of misconduct and threatening legal action against court staff. *Id.* The Court found that "[t]his behavior not only violates the explicit terms of the Court's orders but also undermines their purpose." *Id.* at 2. The Court noted that the restrictions put in place in the Show Cause Order were meant "to prevent disruption, intimidation, and discourteous behavior, which had the effect of harassing court personnel." *Id.* The Court concluded that Plaintiff's email barrage was an attempt to "circumvent those restrictions by shifting his disruptive conduct to electronic communication," and the conduct bordered "on harassment" and was intended "to burden the Court." *Id.*

The Court then instituted additional temporary restrictions and restated the prior ones along with them for clarity. The order stated:

1. Plaintiff is prohibited from entering the courthouse except for scheduled court appearances or when submitting documents through the drop box outside the

clerk's office;

2. Plaintiff is prohibited from calling and/or emailing chambers staff, court staff, or any member of the clerk's office; and

3. All communications with the Court must be made in writing and filed in strict compliance with the procedures described in the Court's last order (ECF No. 30).

*Id.* The Court made clear that "[t]hese restrictions shall stay in place until [the] Court orders otherwise." *Id.* The Court entered the order at 2:27 PM on July 11, 2025, *id.* (entry receipt), and it emailed Plaintiff a courtesy copy that same day at 3:11 PM, ECF No. 58 at 92.

At 3:32 PM that day, Plaintiff emailed the Court's staff and the Clerk of Court with a filing attached. In the email, Plaintiff cited the Additional Restrictions Order, acknowledged the restrictions in it, said he is objecting, and told the staff that he expected his attached filing to be "entered timely and in full." ECF No. 58 at 91. He concluded the email by stating: "I will not stand down, and I will not be gaslit out of my right to pursue due process." *Id.* at 92. Attached to the email was an objection to the Court's order and a motion for the Court to recuse. *Id.* at 93–99.

That same afternoon and evening, Plaintiff sent four more emails to the Court's staff and the Clerk of the Court. *Id.* at 100-120. Several of the emails had filings attached to them. A persistent stream of emails and filing attachments were then sent to the Court's staff, the Clerk of the Court, and/or the staff of the Chief Judge of this District from July 14 until July 24, 2025. *Id.* at 121–286. In total, Plaintiff sent nearly nineteen emails to this group of courthouse employees as well as others after the Court ordered Plaintiff to cease email communications and filings. *Id.* at 91–286; ECF No. 76. Between the removal of this case on June 30, 2025, and the show cause hearing on July 24, 2025, Plaintiff filed a total of twenty-eight motions and ten notices of filings. These motions morphed from alleged procedural deficiencies in removal to alleging that courthouse staff had conspired against him and engaged in misconduct.

The Court held the show cause hearing on July 24, 2025. The testimony from that hearing

is outlined below. After hearing the testimony and personally observing Plaintiff's disruptive, disrespectful, and contemptuous behavior during the hearing, the Court ordered him not to enter the courthouse. The Court followed that oral order with an interim written order (the "Interlocutory Order") the next day. ECF No. 61. In the Interlocutory Order, the Court briefly summarized the evidence and findings and then placed the following restrictions in place:

1. Plaintiff shall not enter the Charles Evans Whittaker United States Courthouse located at 400 East Ninth Street, Kansas City, Missouri 64106 unless he has a scheduled court date;
2. Plaintiff is prohibited from calling and/or emailing chambers staff, court staff, or any member of the Clerk's Office; and
3. All communications with the Court must be made in writing and filed via the mail or through the Court's Electronic Document Submission System.[] No filings shall be made via email.

*Id.* at 2. The Interlocutory Order made clear that Plaintiff "**cannot** make any filings or contact through email." *Id.* It also stated that "the restrictions shall stay in place until the Court orders otherwise." *Id.* The Court concluded the Interlocutory Order—like previous orders—by making clear that violating it may expose him to a range of sanctions, including dismissal of the case and/or the initiation of criminal content proceedings. *Id.*

Since the entry of the Interlocutory Order on July 25, 2025, Plaintiff has filed eight motions and six notices of filing. ECF Nos. 62–66, 68–75, 78. These motions largely criticized how the Court conducted the show cause hearing, and to a lesser extent, challenged Defendant's counsel's presence at the hearing. *Id.* Plaintiff has filed these documents through EDSS. To the Court's knowledge, since the entry of the Interlocutory Order, Plaintiff has not violated it.

## II.   Show Cause Hearing Testimony

The Court called seven witnesses to provide testimony during the hearing. Plaintiff did not call any witnesses, but he testified in his own defense. The Court has considered all the testimony, and its findings are summarized below. Any failure to mention a particular piece of testimony

should not be construed as a comment on its probative value, as the Court reached its findings of fact and conclusions of law based on the entire record. As an overview, however, the Court found the testimony of all witnesses to be credible, except for Plaintiff's testimony. His testimony was not believable because it wholly contradicted the credible accounts from the other seven witnesses and was inconsistent with the Court's observation of his conduct throughout this litigation.

Gloria Woods is a Case Manager in the Clerk's Office. Her duties include managing the intake of cases and assisting individuals who are filing documents. In this capacity, she had approximately three to four in-person interactions with Plaintiff in the Clerk's Office. Ms. Woods was located at a desk behind a glass window during these encounters, and Plaintiff was on the other side of the glass in the publicly accessible portion of the Clerk's Office. Plaintiff's conduct towards her was condescending, angry, aggressive, combative, and disrespectful, including calling her stupid and unprofessional. At times, Plaintiff would raise his voice or yell at her. When Plaintiff's demands were not met, he would escalate the confrontations. Although Ms. Woods was not intimidated by him, she was grateful for the glass barrier between them because she was worried he may have escalated the confrontation even more without the barrier.

Ms. Woods could not recall the exact dates of all the encounters or everything Plaintiff said. Ms. Woods believed that one of the encounters was on July 9, 2025. On at least one occasion, he was in the Clerk's Office for over two hours and security was called to deal with the situation. Security was also called during another encounter with Plaintiff in the Clerk's Office. Ms. Woods received a call from Plaintiff after the Court had entered the Additional Restrictions Order (ECF No. 40) that prohibited calls to the Clerk's Office. She told him he was prohibited from calling and terminated the call. She estimated that he called the Clerk's Office between five and ten times, but she was not clear about when all these calls occurred.

Renea Matthes Mitra is the Operations Manager in the Clerk's Office. She has worked in this role for four-and-a-half years. She has many duties in this role, but most relevant to this case were her supervisory duties over the case processors and case managers in the Clerk's Office. Ms. Mitra's office is only twenty-five to thirty feet from the intake desk in the Clerk's Office where her employees interact with customers on the phone and in person. From this position, Ms. Mitra could hear Plaintiff's interactions with Ms. Woods because Plaintiff was so loud. Like Ms. Woods, Ms. Mitra could not recall the exact dates of all the interactions, but she remembered around three occasions that Plaintiff came to the Clerk's Office.

Ms. Mitra's testimony about the interactions was consistent with Ms. Woods: Plaintiff was upset, angry, confrontational, loud, and aggressive. For the first few incidents, Ms. Mitra allowed them to unfold and then discussed the encounters with Ms. Woods after they were over. She later told Ms. Woods to get another case processor to deal with Plaintiff when he came in. Plaintiff went through four different case processors during the subsequent encounters due to his behavior, and he kept asking the same questions repeatedly. He would also constantly demand to talk to the Court's staff and say that the Clerk's Office employees were violating his civil rights.

On one occasion, after Plaintiff started misbehaving as outlined above, Ms. Mitra directly intervened to explain what the Clerk's Office employees can and cannot do for Plaintiff. She then told him it was time to leave, and she had a Court Security Officer ("CSO")[5] intervene to escort him out of the building. This infuriated Plaintiff. Ms. Mitra testified that she had never dealt with someone so angry in the Clerk's Office before.

There were multiple occasions where Plaintiff was in the Clerk's Office for around two hours. This is in stark contrast to the average litigant who is only in there for between five and

---

[5] The CSO's are officers with prior law enforcement who are contracted by the United States Marshals Service to provide security at the courthouse.

twenty minutes. Plaintiff's outbursts consumed an enormous amount of resources in the Clerk's Office and were disruptive to office operations. Ms. Mitra described the Clerk's Office atmosphere as typically being quiet and respectful, much like a bank lobby or dentist's office. Plaintiff's conduct completely upset this calm environment, and anyone from the public who was in the Clerk's Office had to experience his misbehavior as well.

Aside from the in-person interactions, the Clerk's Office has spent hours on calls with Plaintiff. Plaintiff called the Clerk's Office several times after being ordered not to do so. Plaintiff's outbursts, disruptions, and the fallout from them has led to the Clerk's Office losing days' worth of work. Plaintiff's behavior caused significant staff stress. Ms. Mitra felt personally threatened and intimidated by Plaintiff's behavior and from a letter he directed at her saying it was her "last chance" to change her behavior.

Randall Henderson is the Chief Deputy of Administration for the Western District of Missouri. In this role, he supervises the finance, jury, and budget departments. On July 9, 2025, he was called down to observe and deal with a situation involving Plaintiff. When he got to the Clerk's Office level, Mr. Henderson observed Plaintiff being boisterous, loud, out of control, demanding, and yelling about his filings. After about ten minutes of observing his conduct, Mr. Henderson stepped in to deescalate the situation. He informed Plaintiff that he cannot be aggressive and angry towards the Clerk's Office employees. Plaintiff would not listen to Mr. Henderson, and he reengaged talking to a Clerk's Office employee and continued being angry and disruptive. Plaintiff also requested to see the Court's staff to discuss the case. Deputy United States Marshals ("DUSM") were eventually called to deescalate the situation, but Plaintiff continued to be loud, angry, and uncooperative when they arrived. Mr. Henderson estimated that the entire altercation in the Clerk's Office lasted around two hours.

Matthew Cross is a CSO at the courthouse. Officer Cross has been in law enforcement for thirty-one years, and he had three interactions with Plaintiff in the courthouse. On the first occasion, he received an alert that the Clerk's Office employees needed law enforcement assistance in the office. Once in the room, he learned that Plaintiff had been directed to leave due to his conduct, and Officer Cross asked him to leave the office. Plaintiff started arguing with Officer Cross. Plaintiff was loud, disrespectful, and talked over Officer Cross, but Officer Cross did not want to escalate the situation by arguing back. Plaintiff eventually left. This was before the incident on July 9, 2025.

On July 9, 2025,[6] Officer Cross was called again to the Clerk's Office because of the same alleged behavior by Plaintiff. This time DUSMs were also called to intervene. Plaintiff eventually left the building.

On the third occasion, after Plaintiff had been ordered not to enter the Clerk's Office on July 10, 2025 (ECF No. 40), Plaintiff looked like he was trying to go into the Clerk's Office rather than just using the drop box outside the office. Officer Cross got between Plaintiff and the Clerk's Office to cut off his entry. Plaintiff then sat in a seat and asked to see the head of security. The DUSMs were again notified about his presence and came down. During this encounter, he was difficult to talk to, highly agitated, and upset.

Plaintiff was not detained, arrested, or cited on any of these occasions. But on several of the occasions it required between two and four CSOs and other individuals to respond to his behavior. Officer Cross testified that these disturbances took away from the CSOs' other security responsibilities in the courthouse.

Albert Devalkenaere, another CSO, recounted a similar experience with Plaintiff. Officer

---

[6] Officer Cross could not recall the exact date, but he said it was the same day that Mr. Henderson responded. So the Court finds that this testimony was referring to July 9, 2025.

Devalkenaere has been in law enforcement for forty-nine years and has worked as a CSO for six years. On July 9, 2025, Officer Devalkenaere had a lengthy interaction with Plaintiff in the Clerk's Office. That afternoon, Officer Devalkenaere was patrolling the Eighth Floor of the courthouse when he received a notification that there was a disturbance in the Clerk's Office. He immediately responded, and he stayed outside the door to the Clerk's Office to observe Plaintiff's behavior through the glass doors and windows. He observed Plaintiff pacing around the Clerk's Office, elevating his voice, and talking to the Clerk's Office staff. Officer Devalkenaere then entered the Clerk's Office to get between Plaintiff and Mr. Henderson and another court employee because Plaintiff was getting more agitated and because Officer Devalkenaere was concerned that Plaintiff's behavior could become assaultive.

Officer Devalkenaere engaged Plaintiff and told him he needed to make his filing and leave. Plaintiff told him he would file it when he wanted to, and Plaintiff started pointing over Officer Devalkenaere's shoulder at Mr. Henderson and questioning his integrity. Officer Devalkenaere believed that Plaintiff was trying to provoke Mr. Henderson into responding and cause a breach of the peace. Plaintiff was the only one being aggressive and yelling during this time; the employees and officers were trying to deescalate the situation. Plaintiff was loud, angry, disrespectful, and condescending during this outburst. He said he was smarter than everybody in the room, and Plaintiff kept talking in loops about the same topics.

Officer Devalkenaere eventually deferred to the DUSMs when they arrived in the Clerk's Office. In total, it took three to four CSOs and three DUSMs to deescalate the situation. From Officer Devalkenaere's perspective, this type of resource response created security vulnerabilities in the building because it drew CSOs from their typical patrol duties throughout the building. Overall, Officer Devalkenaere believed that Plaintiff was trying to provoke a physical response

from law enforcement or courthouse employees.

Larry Duncan is a DUSM in the Western District of Missouri, and he has been in law enforcement for twenty-five years. Deputy Duncan had two encounters with Plaintiff. On July 11, 2025, he attempted to serve the Show Cause Order on Plaintiff at his house. Plaintiff would not come to the door, and he would only talk to Deputy Duncan and the other DUSM through the Ring doorbell. Plaintiff would not let them talk and kept telling them to get off his property.

Later that same day, Deputy Duncan tried to serve the Show Cause Order on Plaintiff when he came to the courthouse. Deputy Duncan tried explaining that he was the DUSM who came to his house earlier, but Plaintiff responded that he knew his rights, knew when the hearing was, and told Deputy Duncan to stop harassing him. Plaintiff would not accept the Show Cause Order, forcing Deputy Duncan to drop it near him. Plaintiff later picked it up. During this encounter, Plaintiff was not threatening, but he was loud, agitated, disrespectful, and kept talking over Deputy Duncan.

Caleb Smith is also a DUSM here in the Western District of Missouri. He responded to the disturbance in the Clerk's Office on July 9, 2025. He was accompanied by Deputy Brandon Redetzke. By the time Deputies Smith and Redetzke had arrived, Plaintiff had already been in the office around an hour-and-a-half. Deputy Redetzke talked to Plaintiff immediately upon entering. Plaintiff was loud, agitated, disruptive, pacing around, talking over everyone, and bouncing between various people in the Clerk's Office. He was belittling staff, calling them stupid and unprofessional.

Deputy Smith then approached Plaintiff, and Plaintiff responded that he knew his rights and the officers were trying to intimidate him. Plaintiff threatened to add these deputies to the lawsuit, and he kept talking over them when they tried to talk to him. Eventually, Deputy Smith

called Federal Protective Service ("FPS") to deescalate the situation and escort Plaintiff out of the courthouse because FPS is responsible for securing the public areas around the courthouse. It took another half hour before Plaintiff left the courthouse with FPS escorting him out.

Plaintiff testified that he is proceeding pro se, has some legal training, and does not have a law license. Plaintiff testified that he was not disruptive, loud, angry, or abusive. He testified that he did not call Ms. Woods stupid, and he simply came to the courthouse to have her fix the mistake she made. He testified he only had an issue with Ms. Woods; he did not have any issues with the other employees.[7] He testified he had been to the courthouse between five and ten times since June 30, 2025. He testified he was respectful to the DUSMs, CSOs, and Clerk's Office employees during the interactions in the courthouse.

Plaintiff's conduct during the hearing further corroborated the witnesses' testimony about him. Plaintiff was combative and argumentative. He repeatedly violated the Court's orders about the scope and method of questioning, and he argued with the Court about court rulings. In response to adverse rulings, Plaintiff smiled sarcastically and shook his head. During the witnesses' testimony, he would shake his head, roll his eyes, and/or scoff at what they were saying. The Court nearly removed Plaintiff from the courthouse several times during the hearing due to his contemptuous behavior. Plaintiff was generally disrespectful to the Court and repeatedly questioned the Court's authority. This behavior was consistent with the interactions with the Clerk's Office staff, law enforcement, and the Court's staff.

---

[7] Plaintiff mentioned in filings and at the hearing that he wanted other witnesses from the Clerk's Office to be called to demonstrate he was respectful to them. Even assuming any witnesses from the Clerk's Office would have testified consistently with what he claims, it would not change the Court's ultimate findings because seven witnesses documented the other instances in which he was disruptive, loud, angry, aggressive, etc.

15

### III.   Administrative Burden and Threats from Plaintiff's Conduct.

There has not only been a strain on the Clerk's Office staff and law enforcement, but also on the Court and its staff. The Court's staff has spent multiple days monitoring, compiling, organizing, and filing Plaintiff's thirty-two emails and attached filings that he sent to the Court's staff. These emails and filings span over 300 pages. *See* ECF Nos. 58, 76–77. The Court and its staff have also spent significant time listening to the numerous reports from courthouse and law enforcement regarding Plaintiff's in-person outbursts, reviewing all the voluminous filings, preparing for the show cause hearing, drafting memoranda regarding the various legal issues in the case (e.g., courthouse access and communication restrictions, potential criminal contempt, potential dismissal of the case, etc.), and drafting numerous orders about Plaintiff's conduct.

Like the Clerk's Office staff, Plaintiff has also targeted the Court's staff. As noted above, he was rude and aggressive on a call. And when the Court's staff refused to provide their names on the call due to security reasons, Plaintiff then sent numerous emails and filings attacking the staff for this. *See, e.g.,* ECF No. 58 at 38–120. When the Court's staff emailed Plaintiff courtesy copies of orders, Plaintiff responded with emails and filings claiming that the staff had entered orders without the Court's permission and/or manipulated his filings. *Id.*

### Discussion

The primary issues before the Court are whether—and if so, to what extent—the Court should limit Plaintiff's access to the courthouse and his ability to communicate with the Court's staff and the Clerk's Office employees.

The Supreme Court has made clear that courts "are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)

16

(quotation marks omitted). This inherent authority arises from the "control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (quotation marks omitted). Courts not only have these inherent powers, but they also have a "constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions." *In re McDonald*, 489 U.S. 180, 184 (1989) (quoting *In re Martin-Trigona*, 737 F.2d 1254, 1261 (2d Cir. 1984)). The Court's powers to maintain respect, decorum, and judicial order in proceedings extend to the entire courthouse premises. *See Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966) ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").

Access to the courts is a constitutional right, but that right is not unfettered and absolute. *See Grady v. Wilken*, 735 F.2d 303, 305 (8th Cir. 1984). To the contrary, "an individual is only entitled to meaningful access to the courts." *See In re Chapman*, 328 F.3d 903, 905 (7th Cir. 2003). Where, as here, a litigant engages in "abusive and disruptive conduct, courts have the authority to issue orders restricting the individual's access to courthouses or the manner in which court services may be accessed." *In the Matter of Jordan*, No. 2:23-mc-00154-PSG, 2023 WL 12056750, at *5 (C.D. Cal. Nov. 8, 2023). When these rare—but serious—situations arise, district courts may limit a litigant's physical access to a courthouse as well as his ability to contact court staff via email, phone, fax, or other avenues. *See id.*; *see also Uzamere v. Gregg*, No. 1:25-CV-24-AJB/PJE, 2025 WL 1134615, at *1–2 (N.D.N.Y. Apr. 17, 2025) (noting a no contact order entered against a litigant who had engaged in harassing communications with the clerk's office and chambers staff); *Phillips v. Texas Dep't of Ins. Div. of Workers Comp.*, No. 3:24-CV-02605-E-BK, 2024 WL 6077239, at *1 (N.D. Tex. Nov. 15, 2024) (summarizing order barring litigant from "communicating with clerk's office staff about her cases in person or by telephone, email, or

facsimile transmission" because of her "history of harassing clerk's office staff."); *In re Vazquez*, No. 1:22-PF-0002 (GTS), 2022 WL 1303849, at *3 n.5 (N.D.N.Y. May 2, 2022) (same); *Talley v. United States Dep't of Labor*, No. 19-00493-CV-W-ODS, 2020 WL 4142377, at *4 (W.D. Mo. July 20, 2020) (imposing sanctions because of harassing emails to the court and its staff).

The Eighth Circuit and other Circuit Courts have also previously imposed similar restrictions when litigants harassed and verbally abused court staff. *See Khayet v. Cushing*, No. 8:18-CV-00330, 2025 WL 1136031, at *1 (D. Neb. Apr. 17, 2025) (quoting Eighth Circuit order "barring [the pro se litigant] from having any contact with the Eighth Circuit Clerk of Court or any member of the Clerk's Court's staff regarding these cases remains in effect. Contact includes emails, faxes, phone calls, text messages, filings in any of these cases and any other form of direct or indirect contact."); *Mestman v. Jones*, 670 F. App'x 752, 753 (3d Cir. 2016) ("We note that Mestman has been calling the Clerk's Office and the Circuit Executive's Office on a daily basis and yelling at and berating their staff. Due to the abusive nature of her phone calls, Mestman is prohibited from calling the Clerk's Office or any other office of this Court."); *Kaminetzky v. Frost Nat. Bank of Houston*, 881 F. Supp. 276, 278 (S.D. Tex. 1995) ("The Fifth Circuit has likewise sanctioned contentious conduct by parties and prohibited them 'from contacting the Clerk's office of this Court or the chambers of any judge on this Court by telephone or in person.'").

In imposing any court access restrictions the Court is mindful that it should tailor the restrictions to address only the types of misconduct and abuse at issue. *See In re Phillips*, 774 F. App'x 296, 297 (7th Cir. 2019); *Smith v. United States*, 386 F. App'x. 853, 857 (11th Cir. 2010). And the Court must also ensure that its restrictions do "not completely foreclose[]" the litigant "from any access to the courts." *United States v. Etienne*, 102 F.4th 1139, 1147 (11th Cir. 2024); *see also In re Chapman*, 328 F.3d at 905 ("Here, the Committee's order does not bar the courthouse

door to Mr. Chapman but, rather, allows him meaningful access while preventing repetitive or frivolous litigation.").

Based on the hearing testimony, the Court's observations at the hearing, the Court staff's interactions with Plaintiff, and the record as a whole, the Court limits Plaintiff's access to the courthouse and his ability to contact the Court's staff, the Clerk of the Court, and the Clerk's Office staff, including any member of the Clerk's Office. The Court does not reach this decision lightly. In fact, in the Court's long career as a judge in state and federal court, the Court only recalls one other situation where similar restrictions were necessary. But they are required here because of Plaintiff's repeated abusive, harassing, and disruptive conduct in the Clerk's Office, the courthouse lobby, and through phone calls and email. Accordingly, for the reasons stated below, it is hereby ORDERED that:

1. Plaintiff shall not enter the Charles Evans Whittaker United States Courthouse located at 400 East Ninth Street, Kansas City, Missouri 64106, unless he has a court hearing in one of his cases;
2. If Plaintiff enters the courthouse for a hearing in one of his cases, he must immediately report to a Court Security Officer in the lobby and request an escort to and from the courtroom and shall not enter the Clerk's Office under any circumstance;
3. Plaintiff is prohibited from calling or emailing the Court's staff, the Clerk of the Court, or the Clerk of the Court's staff—including any member of the Clerk's Office—about this case; and
4. All communications with the Court about this case must be made in writing and filed via the mail or through the EDSS. No filings shall be made via email.

These restrictions will stay in place through final judgment in this case. The Court addresses the courthouse restrictions before turning to the communication restrictions.

**I.      Unless Plaintiff is attending a court hearing in this case, he is barred from entering the courthouse for the remainder of this case.**

As documented above, Plaintiff has disrupted operations in the Clerk's Office and in the courthouse lobby on several occasions over the last few months. In these situations, he has been loud, aggressive, verbally abusive, and harassing towards the Clerk's Office staff and law

19

enforcement. His conduct suggests he may become physically abusive, and he appears to be trying to provoke a physical reaction from law enforcement.

Courthouse access limitations are warranted for many reasons. First, this conduct has prevented the Clerk's Office staff from completing their critical administrative and clerical work on the hundreds of active cases in this district, thereby impeding the administration of justice. Second, Plaintiff's misbehavior and the fallout from it has required a great deal of the Court's attention over the last month and prevented the Court from dedicating more time to its many other cases. Third, his outbursts have created potential security risks throughout the courthouse because CSOs and DUSMs have repeatedly come from their regular security posts to address his misbehavior. Fourth, Plaintiff's misconduct has also threatened the emotional and physical well-being of the Clerk's Office staff, law enforcement, and the public in the courthouse.

Thus, to conserve scarce judicial and clerical resources, to ensure a secure courthouse, to protect those in the courthouse from Plaintiff's physical and emotional threats, and to restore order and decorum in the courthouse, the Court finds that it must bar Plaintiff from accessing the courthouse for the remainder of this case. The only exception to this restriction is if Plaintiff enters the courthouse to attend a hearing in one of his cases. In that situation, as stated above, he must immediately report to a CSO in the lobby and request an escort to and from the courtroom and shall not enter the Clerk's Office under any circumstance.

The Court also finds that these courthouse restrictions are the least restrictive means to accomplish the legitimate interests and goals mentioned above. The Clerk's Office staff and law enforcement have shown immense patience with Plaintiff's conduct. They have repeatedly tried to reason with him and deescalate his many outbursts for hours on end. This has not been successful. He has been loud, aggressive, angry, and disrespectful even after senior members of

20

the Clerk's Office staff and law enforcement intervened. In fact, he even reached over law enforcement or ignored them to further escalate the outbursts with Clerk's Office employees. This suggests that not even a law enforcement escort in the courthouse while he makes filings will sufficiently prevent further disruptions and threats to individuals.

The Court further finds that if Plaintiff is allowed to keep making filings in the courthouse, he will continue with this type of behavior. These were lengthy, repeated incidents. It was not some isolated event that Plaintiff acknowledged, regretted, and agreed to refrain from in the future. Despite Plaintiff listening to all the credible and consistent accounts of his misbehavior, Plaintiff— while under oath—denied doing anything wrong. That shocked the Court. Plaintiff's denial suggests that he either believes what he did was acceptable conduct for a courthouse or that his actions were justified. Either way, this suggests that Plaintiff will repeat this behavior if he is allowed in the courthouse to make filings. This conclusion is further bolstered by Plaintiff's disrespect towards the Court and witnesses during the hearing. He continually disregarded the Court's orders, argued with the Court, and scoffed at the testimony of witnesses. The Court nearly removed Plaintiff from the courthouse several times due to his misconduct. If Plaintiff cannot even conduct himself respectfully in the courtroom during a hearing, the Court does not believe he will be able to do so in the Clerk's Office or courthouse lobby. *See Huminski v. Corsones*, 396 F.3d 53, 86 (2d Cir. 2005) ("[C]ourt administrative, judicial, and other officials must at least have the ability to close the courtroom door to any person whom they reasonably think may pose a threat to person, property, or decorum.").

Although Plaintiff's courthouse access is limited, the Court's order does not cut off all access to the court. *See In re Chapman*, 328 F.3d at 905. To be sure, Plaintiff's *preferred* method of filing has been restricted because he abused that process by needlessly consuming scarce judicial

and clerical resources and threatening the emotional and physical well-being of others with his repeated and lengthy outbursts. But Plaintiff is still able to file in this case or any other case so long as he uses EDSS or the mail. *See Etienne*, 102 F.4th at 1147. In fact, Plaintiff has already shown his prowess at using EDSS, filing eight motions and six notices of filing since the Court barred him from entering the courthouse at the show cause hearing. *See* ECF Nos. 62–66, 68–75, 78. This places Plaintiff on equal footing with most litigants in this Court, as nearly all of them file electronically for the entirety of their cases without ever setting foot in the courthouse. He may also continue entering the courthouse to attend any court hearings in his cases. But when he does so, he must immediately report to a CSO in the lobby and request an escort to and from the courtroom and shall not enter the Clerk's Office under any circumstance.[8]

Given all the ways in which Plaintiff still has access the court, the doors are not completely shut in either the literal or figurative sense. *See In re Kowalski*, 765 F. App'x 139, 140 (7th Cir. 2019) ("To curtail Kowalski's disruptive conduct, the Executive Committee issued the order in its 'proprietary capacity, just like a restraint that expels an unruly customer and forbids him to return.' The order impacts only *how* Kowalski accesses the courthouses, not *whether* he may." (internal citation omitted)). Thus, the Court finds that these restrictions are necessary and appropriate under the unique circumstances of this case.

---

[8] The rationale for allowing Plaintiff in the courthouse for hearings—but not for filings—is that hearings will be few and far between, so there will be less of a drain on law enforcement resources, less security vulnerabilities created, and less threats to the employees, law enforcement, and public in the courthouse. On the other hand, if he is allowed to make filings with an escort, he may be coming in as many as three to five times a day given the frequency of his filings in this case. This would increase the resource drain, security vulnerabilities, and threats to the employees, law enforcement, and the public in the courthouse. Moreover, there are several ways Plaintiff may file remotely, but conducting a hearing virtually is much more difficult. Considering all of this, the Court finds that on the few occasions in which Plaintiff may have a hearing, the least restrictive alternative is to allow him to enter the courthouse, go to the courtroom, and always have a law enforcement escort while in the courthouse.

## II.    Plaintiff is prohibited from calling or emailing the Court's staff, the Clerk of the Court, the Clerk of the Court's staff—including any member of the Clerk's Office—about this case.

After the Court entered the Show Cause Order (ECF No. 28) prohibiting Plaintiff from accessing the courthouse except for attending hearings and submitting filings in a drop box, Plaintiff moved his aggressive, abusive, and threatening conduct to the digital realm.  The day after the Show Cause Order was entered, he called the Court's chambers and was aggressive, combative, and disrespectful.  Once the call was ended due to his behavior, he repeatedly called back.  Then, after the Court entered the Additional Restrictions Order (ECF No. 40) that further prohibited him from calling and emailing the Court's staff and the Clerk's Office, Plaintiff sent nineteen emails to the Court's staff and the Clerk of the Court about baseless claims of misconduct. He also repeatedly called the Clerk's Office.

The Court finds that this conduct requires restrictions on Plaintiff's ability to call and email certain courthouse staff.  Like Plaintiff's in-person conduct, Plaintiff's repeated emails and calls waste valuable resources and amount to harassment.  The Court and the Court's staff have wasted many days reviewing, analyzing, compiling, and uploading Plaintiff's unnecessary, improper, and harassing emails.  This has diverted valuable time that could be used working on the Court's many other cases or even the substantive motions in Plaintiff's own case.  The nature and frequency of Plaintiff's calls and emails has also caused stress and fear for the Court's staff.  The same can be said for the calls to the Clerk's Office: they have caused stress and wasted valuable resources.

Thus, to conserve scarce judicial and clerical resources and to protect courthouse employee's from Plaintiff's harassment and threats, the Court finds that it must restrict him from calling or emailing the Court's staff, the Clerk of the Court, and the Clerk of the Court's staff— including any member of the Clerk's Office—about this case.  *See Khayet*, 2025 WL 1136031, at

*1 (quoting Eighth Circuit's prohibition on communicating with the Clerk of the Court and his staff); *Mestman*, 670 F. App'x at 753 (prohibiting communications with the Clerk of the Court and staff); *see also Bonazza v. MUFG Bank, Ltd.*, No. 23-CV-01161-JCS, 2024 WL 3669472, at *2 (N.D. Cal. Aug. 5, 2024) (prohibiting phone calls and emails from litigant who repeatedly emailed and called chambers for no legitimate reason); *Talley*, 2020 WL 4142377, at *4 (sanctioning counsel for violating order prohibiting email communications with chambers).

The Court finds that this is the least restrictive means of accomplishing these goals. If a prohibition on emailing and calling is not put in place, Plaintiff will continue wasting resources and threatening staff. Plaintiff has shown repeatedly that he is not capable of conducting himself respectfully and responsibly on phone calls or in-person. The Court finds that he will continue to do so if he is allowed to keep calling. Moreover, if emails are not prohibited, he will continue flooding the staff's inboxes with a constant stream of threatening and baseless emails.

Although Plaintiff is restricted from calling or emailing the individuals noted above, this does not close the courthouse doors to him. *See In re Chapman*, 328 F.3d at 905. As an initial matter, Plaintiff does not need to be calling or emailing the Clerk's Office members, the Clerk of the Court, or her other staff.[9] Plaintiff has proven he can file through EDSS as mentioned above, so he does not need the Clerk's Office's assistance in making filings. And his interactions with the Clerk's Office staff have shown he is not really seeking guidance or assistance from them; rather, he calls and visits the Clerk's Office to accuse them of misconduct, harass them, and cause

---

[9] The communication restrictions not only apply to the members of the Clerk's Office, but also the Clerk of the Court and all her staff. The reason for this extension is because Plaintiff has sent the Clerk of the Court many emails about baseless misconduct allegations, and he has also started targeting her supervisory staff, including Ms. Mitra. Given that other Clerk of the Court staff members responded to his outburst and/or testified at the hearing, it is likely that Plaintiff will next target them as part of his harassment campaign. Throughout this litigation, he has shown that individuals he communicates with at the court often become the focus of his next batch of baseless allegations. Moreover, like members of the Clerk's Office, Plaintiff does not need to be communicating via email or phone with the Clerk of the Court or her staff. He can raise any questions, complaints, or requests he has about this case by submitting written communications via the EDSS or mail.

disruptions.  To the extent he has any genuine questions, complaints, or requests related to his case, he can consult the robust resources on the Court's website that exist to assist litigants.  If questions persist after consulting those resources, then he can file his questions or concerns in written form through the EDSS or the mail.

Like the Clerk's Office staff, Plaintiff also does not need to be calling Court's staff. Because of the ethical requirements against ex parte communications and because the Court wants to ensure all communications are captured in the ECF record, the ISO already prohibits Plaintiff from calling and emailing the Court's staff except in rare circumstances.  ECF No. 13 at 2.  This policy applies to all litigants, whether represented or not.  And even if Plaintiff were allowed to call and email chambers to ask questions, that is not what he has been calling and emailing the Court's staff about.  His calls and emails are simply meant to threaten, harass, and cause disruptions.

In short, the communication restrictions have not—and will not—hinder Plaintiff's ability to litigate this case.  Plaintiff may still file motions, correspondence, questions, complaints, or any other requests through the EDSS or the mail.  The Court's restrictions will ensure that his communications are accurately and completely captured in the record, while also conserving resources and protecting courthouse staff.

## Conclusion

For the reasons stated above, it is hereby ORDERED that:

1.  Plaintiff shall not enter the Charles Evans Whittaker United States Courthouse located at 400 East Ninth Street, Kansas City, Missouri 64106, unless he has a court hearing in one of his cases;
2.  If Plaintiff enters the courthouse for a hearing in one of his cases, he must immediately report to a Court Security Officer in the lobby and request an escort to and from the courtroom and shall not enter the Clerk's Office under any circumstance;
3.  Plaintiff is prohibited from calling or emailing the Court's staff, the Clerk of the Court, or the Clerk of the Court's staff—including any member of the Clerk's Office—about

25

this case; and

4. All communications with the Court about this case must be made in writing and filed via the mail or through the EDSS. No filings shall be made via email.

These restrictions will stay in place through final judgment in this case. The restrictions in this order override and replace all previous restrictions and any provisions in the Court's ISO (ECF No. 13) that allow for emailing or calling the Court's staff in a few limited situations. The Court will also be referring Plaintiff's conduct to the Chief Judge of this District to determine whether these restrictions should become permanent after the conclusion of this case.

The Court warns Plaintiff that failure to follow the Court's orders may result in the imposition of civil sanctions under Federal Rule of Civil Procedure 11, Rule 41(b), 28 U.S.C. § 1927, and/or the Court's inherent authority. These sanctions may include monetary fines, limitations on his filing privileges, and/or dismissal of this case with or without prejudice. Failure to follow the Court's orders may also result in the imposition of criminal penalties for criminal contempt of court under 18 U.S.C. § 401 and/or the Court's inherent authority.

**IT IS SO ORDERED**.

Date:   August 15, 2025                         /s/ Greg Kays
                                                GREG KAYS, JUDGE
                                                UNITED STATES DISTRICT COURT